**UNITED STATES** ex rel. Franklin **CARIOSCIA**, Petitioner,

v.

**John C. MEISNER, Respondent.**

**UNITED STATES** ex rel. Fred **CODUTO,** Petitioner,

v.

**John C. MEISNER, Respondent.**

**UNITED STATES** ex rel. Louis **GUIDO,** Petitioner,

v.

**John C. MEISNER, Marshall, Respondent.**
Nos. 71 C 906, 71 C 950, 71 C 1495.

United States District Court,
N. D. Illinois, E. D.
Sept. 10, 1971.

Robert S. Bailey, Ronald P. Alwin, Chicago, Ill., for petitioners Coduto and Carioscia.

Julius Lucius Echeles, Frederick F. Cohn, Chicago, Ill., for petitioner Guido.

William J. Bauer, U. S. Atty., Douglas M. Roller, Asst. U. S. Atty., Chicago, Ill., for respondent.

## OPINION

WILL, District Judge.

Petitioners, Franklin Carioscia, Fred Coduto, and Louis Guido, all in the custody of the United States Marshal pursuant to revocation of their mandatory releases by the United States Board of Parole, have applied for writs of habeas corpus pursuant to Title 28 of the United States Code, Sec. 2241 et seq. The central question presented by each of the petitions is whether the petitioners were deprived of their liberty without due process of law because of the limited scope of the hearing provided to them by the United States Board of Parole prior to revocation of their mandatory releases.

## FACTS

The specific facts of each petition vary slightly, although the controlling facts are essentially the same for each petitioner. The following compendium has been gathered from the documents filed in this case as part of the record and from the hearing held by this Court on June 28, 1971.

Carioscia, Coduto, and Guido were convicted of violations of the federal narcotics laws in 1964, 1959, and 1963, respectively, and were sentenced to confinement for varying lengths of time under the statutory provision that they not be eligible for parole. They remained in federal custody until December 29, 1969, July 18, 1969, and February 28, 1969, respectively, when they were each released pursuant to the provisions of Section 4163, Title 18, United States Code, which release is commonly known as the mandatory release.

Under the applicable statutes, a mandatory releasee remains under the jurisdiction of the United States Board of Parole and is subject to all provisions of the law relating to parole, as if he were actually on parole. 18 U.S.C. § 4164. A mandatory releasee, thus, is in a status similar to a parolee in that he is released from incarceration prior to the actual expiration of his prison sentence, is subject to the same rules and regulations, and is subject to having his release status revoked under the same procedures for violation of the rules and regulations applicable to parolees. The only difference between a parolee and a mandatory releasee is that a parolee is released at the discretion of the Parole Board whereas a releasee is automatically released prior to the termination of his prison term according to the extent of the statutory good time that he has accrued, notwithstanding the Parole Board's denial of or his ineligibility for

parole. There is no discretion in the Board to deny a mandatory release.

On February 22 and 23, 1971, while out of prison as mandatory releasees, the petitioners were arrested by federal agents and charged with violations of the federal narcotics laws. They were indicted by a federal grand jury and held in custody until they were able, in mid-March, to post bond. Later in March, separate warrant applications were made to the Parole Board requesting the arrest of petitioners on the ground that they had violated the terms of their mandatory releases in that they had (1) violated the federal narcotics laws (the same violations which formed the basis for their arrest and criminal indictment) and (2) associated with persons having criminal records (the acts of association constituting some of the acts alleged in their indictments). The warrant applications stated that the information upon which they were based had been furnished by specific United States Probation Officers. The warrants were recommended to the Board by James R. Pace, Parole Executive, United States Board of Parole, and were subsequently issued. On April 20, 21, and 23, 1971, Pace held mandatory release revocation hearings in Chicago for the petitioners Coduto, Guido, and Carioscia, respectively. The Board of Parole, on May 3, 1971, revoked the mandatory releases of all three petitioners.

## ISSUES

The petitioners raise varying grounds in support of their petitions for writs of habeas corpus. These include the following: (1) government officials have acted arbitrarily and capriciously in that the mandatory release revocation warrants, and subsequent revocations, were obtained for the sole purpose of defeating the orders of the United States District Court setting bonds for them in their criminal cases; (2) no statutory authority existed for the retaking of the petitioners; (3) the holding of a hearing prior to trial of the charges contained in the criminal indictments violated their Fifth Amendment privilege against self-incrimination; (4) the warrants for petitioners' arrests were invalid under the Fourth and Fourteenth Amendments; (5) the holding of the hearings on the warrants by the same officer who recommended their issuance violated due process and the Administrative Procedure Act; (6) the charges in the warrant applications did not charge acts constituting a violation of the conditions of petitioners' mandatory releases; and (7) the revocations based upon the same acts as those which constituted the basis for the current criminal indictments constituted double jeopardy in violation of the Fifth Amendment.

The petitioners further allege that they were deprived of liberty without due process of law and that several of the procedures utilized in the revocation hearings violated the Fifth and Sixth Amendments. These alleged infirmities were that the Parole Executive, Mr. Pace, failed to produce the alleged sources of information contained in the arrest warrants, to allow petitioners to call these sources as witnesses for cross-examination, to allow petitioners to examine the reports of the federal agents upon which the warrant applications were allegedly based, and to allow petitioners to have a court reporter present, all allegedly in violation of the Fifth and Sixth Amendments' guarantees of due process, of compulsory process of witnesses, and of the right to confront adverse witnesses. The Government, not surprisingly, asserts that no constitutional deprivations occurred at any point in the mandatory release revocation proceedings.

From the inception of these proceedings, the petitioners have attempted to persuade the Court to review the substantive decisions of the Board of Parole in the revocation of their mandatory releases. This we have refused to do and, for this reason, carefully limited the scope of the hearing to the due process allegations contained in the petitions. One of the assertions of the petitioners, however, requires us, to a limited degree,

to review the actions of the Parole Board. This assertion involves the allegations that the Board acted arbitrarily and capriciously in seeking and ordering these revocations. Before we review these allegations, it is necessary to set forth our view of the proper role of a district court in this area.

■ The extent of the court's inquiry into a parole revocation is very limited. Rose v. Haskins, 388 F.2d 91, 95 (6th Cir. 1968), cert. denied, 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408; Richardson v. Markley, 339 F.2d 967, 970 (7th Cir. 1965), cert. denied 382 U.S. 851, 86 S.Ct. 100, 15 L.Ed.2d 90; Wright v. Settle, 293 F.2d 317, 319 (8th Cir. 1961); Davis v. United States, 288 F.Supp. 180, 181 (W.D.Mo.1968); Young v. Parker, 256 F.Supp. 1002, 1004 (M.D.Pa.1966). We believe that this rule applies equally to a mandatory release revocation.

■ Specifically, the courts have consistently followed one or two tests in reviewing the actions of the Parole Board in revoking the parole of an individual. The first may be labeled the "capriciousness" test. Under such a test, a court may overturn the Parole Board's determination only if it finds that the Board acted "arbitrarily" or "capriciously". Clark v. Stevens, 291 F.2d 388, 389 (6th Cir. 1961); Freedman v. Looney, 210 F. 2d 56 (10th Cir. 1954); Davis v. United States, supra, 288 F.Supp. at 181; Young v. Parker, supra, 256 F.Supp. at 1004.

Other cases have followed the theory that the court may overturn the action of the Parole Board only on the basis that what was before the Board compelled the conclusion as a matter of law that there had been no violation of parole. United States ex rel. DeFillo v. Fitzpatrick, 378 F.2d 85, 87 (2d Cir. 1967); Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225, 240 (en banc 1963), cert. denied, sub nom., Thompson v. United States Board of Parole, 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315; Wright v. Settle, supra, 293 F.2d at 319; see, also, Strauss v. Moos, 399 F.2d 1022, 1023 (7th Cir. 1968). It is obvious, of course, that the two tests are closely related since, if there had been no violation of parole, revocation would be arbitrary or capricious.

■■ Regardless of which theory is followed, the cases have been fairly consistent in delineating the bounds of the court's inquiry during a habeas corpus proceeding challenging revocation of parole. It is clear that the court should not and may not substitute its judgment for that of the Board. Wright v. Settle, supra; Freedman v. Looney, supra; Young v. Parker, supra. Likewise, the court may not inquire into the reliability or sufficiency of the information presented to the Board. United States ex rel. DeLucia v. O'Donovan, 178 F.2d 876, 879 (7th Cir. 1950); Fox v. Sanford, 123 F.2d 334, 335 (5th Cir. 1941); Rogoway v. Warden, 122 F.2d 967 (9th Cir. 1941), cert. denied, 315 U.S. 808, 62 S.Ct. 797, 86 L.Ed. 528; Gibson v. Markley, 205 F.Supp. 742, 743 (S.D.Ind.1962). Our function, therefore, as to the contention of arbitrariness, is limited to reviewing the record before the Board to ascertain whether there was any evidence before it upon which it could properly act.

■ A review of the record before the Parole Board demonstrates clearly that considerable information was before it upon which to base its decisions. As to petitioners Carioscia and Guido, the Board had before it the warrant applications which summarized the statements of federal narcotics agents who stated that they had observed the two in the presence of known narcotics violators and ex-felons. The Board had, in addition, copies of letters sent by United States Probation Officers notifying them of the petitioners' arrests and indictments on the drug violation charges. As to Coduto, the Board had this information plus a letter from a Probation Officer indicating the arrest of Coduto plus an affidavit of an agent from the Federal Bureau of Narcotics relating to an investigation of Coduto. As the petitioners' conditions of mandatory release included restrictions against being pres-

ent where narcotics were in use and against associating with persons with criminal records, we believe that the record before the Board could clearly support its actions.

The petitioners contend that the motivation of the Probation Officers in forwarding information concerning them to Washington was the desire of such officers to prevent the petitioners from obtaining their liberty once it appeared that they would be able to make bond in their current criminal cases. Even assuming this to be true, we believe the motives of law enforcement officials who submit information to a Probation Officer or of Probation Officers who submit information to the Parole Board concerning the violation of parole or mandatory release by a parolee or releasee is irrelevant.

If the petitioners violated the conditions of their releases, it was within the discretion of the Board to make that determination, Wright v. Settle, *supra;* Freedman v. Looney, *supra;* Young v. Parker, *supra,* and to decide whether or not such violations warranted revocation. Hyser v. Reed, *supra,* 318 F.2d at 238. Because the submissions and recommendations of law enforcement officers, probation officers, and the hearing examiner are not binding or necessarily persuasive upon the Board, which makes the final determination in all revocation matters, the motives of those who submit the information, assuming it is accurate, is irrelevant. We conclude, therefore, that the action of the Parole Board was supported by the evidence presented to it and may not be classified as so arbitrary and capricious as to deny due process of law to any of these petitioners.

The remainder of the petitioners' arguments concern the issue of whether minimum constitutional safeguards were present in the procedures utilized in these revocation proceedings. In support of these contentions, the petitioners assert various alleged deficiencies as grounds for declaring their results invalid. We shall discuss these grounds one by one.

## AUTHORITY FOR RETAKING

■ The petitioners allege that their retaking was not authorized by the statutes and that the Board of Parole, therefore, exceeded its powers. A simple reading of the relevant statutes, however, establishes that petitioners' claim is totally without merit. Section 4164 of Title 18 of the United States Code provides:

"A prisoner having served his term or terms less good-time deductions shall, upon release, be deemed as if released on parole until the expiration of the maximum term or terms for which he was sentenced less one hundred and eighty days. * * *"

Section 4205 of Title 18 of the United States Code provides:

"A warrant for the retaking of any United States prisoner who has violated parole, may be issued only by the Board of Parole or a member thereof. * * *"

Thus, the statutory authority for the taking of a prisoner on mandatory release is clearly and succinctly set forth in the statutes governing parole. It is obvious that the reason why petitioners have been unable to cite any cases in support of their contention that the Board was without authority to retake a mandatory releasee is because the Courts have consistently held the opposite. *See, e. g.,* Shelton v. United States Board of Parole, 128 U.S.App.D.C. 311, 388 F.2d 567 (1967); United States ex rel. De-Fillo v. Fitzpatrick, 378 F.2d 85 (2d Cir. 1967); Weber v. Willingham, 356 F.2d 933 (10th Cir. 1966); Richardson v. Markley, 339 F.2d 967 (7th Cir. 1965), cert. denied, 382 U.S. 851, 86 S.Ct. 100, 15 L.Ed.2d 90; Powell v. D. C. Parole Board, 121 U.S.App.D.C. 280, 349 F.2d 715 (1965).

## FIFTH AMENDMENT PRIVILEGE

■ Petitioners further allege that because of the factual similarities between the alleged parole violations and the criminal indictments, they could not respond to the charges in the warrant

applications without sacrificing their Fifth Amendment privileges against self-incrimination.

Petitioners' theory is predicated at least in part upon the premise that a revocation hearing is criminal in nature. The Seventh Circuit has specifically held to the contrary. Richardson v. Markley, 339 F.2d 967, 969 (7th Cir. 1965), cert. denied, 382 U.S. 851, 86 S.Ct. 100, 15 L.Ed.2d 90. Similarly, the Second Circuit, in Menechino v. Oswald, 430 F.2d 403, 407 (2d Cir. 1970) has stated:

> "In the first place the Board of Parole is not appellant's adversary. On the contrary the Board has an identity of interest with him to the extent that it is seeking to encourage and foster his rehabilitation and readjustment to society."

The primary purpose of a parole revocation proceedings is to allow the prisoner a meaningful opportunity to explain away or deny the charges or to present witnesses on his behalf to effectuate this purpose. Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566 (1935); Hyser v. Reed, *supra*, 318 F.2d at 240; Davis v. United States, 288 F. Supp. 180, 181 (W.D.Mo.1968). Even if the determination is made by the Board that the petitioner has violated his parole, it may nevertheless elect to continue his parole. Hyser v. Reed, *supra*, 318 F.2d at 238. Thus, the petitioner is not placed in the position of having to deny criminal charges. We also note that a substantial portion of the alleged grounds for revocation of petitioners' mandatory releases was association with persons with a criminal record which, at least by itself, is clearly not a criminal charge.

The Court of Appeals for the District of Columbia Circuit has recently considered the same contentions asserted herein by petitioners. In Melson v. Sard, 131 U.S.App.D.C. 102, 402 F.2d 653 (D.C.Cir.1968), the Court was faced with a factual situation very similar to that presented by these petitions. The petitioner had been indicted while on parole and, on the basis of that indictment but prior to trial of that case, the Board of Parole revoked his parole. The petitioner asserted that his Fifth Amendment freedom from self-incrimination would be violated if he were forced to face the dilemma of whether to testify at the revocation hearing and risk uttering incriminating statements or to remain silent and not testify on his own behalf.

While recognizing the petitioner's dilemma, the Court cited the need for a prompt hearing on the revocation, but stated as follows (402 F.2d at 655):

> "We feel that the parolee's most significant handicap—the fear of self-incrimination—can readily be eliminated. As the Supreme Court has most recently recognized,[5] any self-in-

> [5]. See Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, [19 L.Ed.2d 1247] (1968); Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, [17 L.Ed.2d 562] (1967); Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, [17 L.Ed.2d 574] (1967).

> criminating statements made by an individual in order to protect his basic interests are far from voluntarily made."

The Court went on to compare the revocation proceeding with a motion to suppress and stated (402 F.2d at 655):

> "Similarly, in Simmons v. United States * * * the Court held that incriminatory statements made at a pretrial suppression hearing may not be introduced against a defendant at trial on the issue of guilt.

> "The same interests are at work here. If a parolee is not given the full and free ability to testify in his own behalf and present his case against revocation, his right to a hearing before the Board would be meaningless. Furthermore, his Fifth Amendment rights must not be conditioned 'by the exaction of a price.' Accordingly, we hold that any self-incriminatory statements made in a parole revocation

hearing shall not be used affirmatively against the parolee in any subsequent proceeding."

Although the Seventh Circuit has not had occasion to rule on precisely this issue, we believe that the reading of the prevailing case law by the District of Columbia Circuit is correct and persuasive and would be followed by the federal courts in this district and circuit. Thus, even if we were to find that petitioners' parole revocation proceedings were criminal in nature or were such that the petitioners would be placed in the dilemma which they allege, sufficient exclusionary safeguards existed, at the time of their hearings, to protect them as they would be protected in testifying at a hearing on a motion to suppress. Accordingly, we do not believe that the petitioners' Fifth Amendment privilege against self-incrimination was violated by the holding of the revocation hearings prior to their trial on the criminal indictments. In fact, had the petitioners' releases been revoked with no hearing until after their criminal trials had terminated, we believe that such delay might very well raise serious due process questions. *Cf.*, Hyser v. Reed, *supra*, 318 F.2d at 243.

## HEARING BY OFFICER WHO RECOMMENDED THE WARRANT.

Petitioners next contend that due process and the Administrative Procedure Act were violated by having the same officer who recommended the issuance of the warrants conduct the revocation hearings. Petitioners cite two cases in support of this proposition: Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), and In Re Murchinson, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Neither of these cases, however, supports the petitioners' contentions. *Mayberry* involved a judge who conducted contempt proceedings when he was the judge who had cited the defendant for contempt. The Supreme Court emphasized that the atmosphere in which the defendant was cited for contempt had been highly emotional and

that in such a situation, the judge could not properly try the defendant. *In Re Murchinson* involved a judge, acting as a one man "judge-grand jury", who as the grand jury cited the defendant for contempt and subsequently as judge tried the defendant on that charge.

Neither of these cases is analogous to those before us. In both cases, the final "hearing" and decision was conducted and rendered by the same person. In the present situation, Mr. Pace, the Parole Executive, although he did conduct the hearing, made only a recommendation to the Board of Parole for its review and final decision. The Board, not Mr. Pace, made all final determinations and conclusions. Thus, it is immaterial that Mr. Pace both conducted the hearing and originally recommended that the warrants should issue. The considerations on which the Supreme Court based *Mayberry* and *Murchinson* are not present in the situation presented by the revocation hearing of mandatory release.

In addition, petitioner Carioscia was given an opportunity to appear before a hearing officer other than Mr. Pace. The transcript of Carioscia's hearing clearly indicates that Mr. Pace was willing to have another examiner conduct the hearing, although a one month delay would have occurred if a new hearing had to be scheduled. Under those circumstances, the petitioner Carioscia elected to proceed with Mr. Pace. We believe that, as to this petitioner, he waived any objection to Mr. Pace conducting the hearing.

Petitioners further urge that the holding of the hearing by the same person who issued the warrant violated the Administrative Procedure Act, 5 U.S.C. Sec. 554. In order for this Act to be applicable to the Parole Board, however, the revocation hearing must fit the description of 5 U.S.C. Sec. 554(a): "In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing * * *". These words limit

**644**

coverage of the Act to agency proceedings which are required by their own statute of creation to adjudicate after hearing. We find nothing in the statutes relating to the Board of Parole which requires them to "adjudicate after hearing". We conclude, therefore, that revocation hearings are not covered by the Administrative Procedure Act. Accordingly, having the Board officer who recommended the warrant conduct the hearing did not violate that Act. *See,* Hyser v. Reed, *supra,* 318 F.2d at 237. In any event, the Board, not the hearing officer, was the final decision maker. Having so concluded, however, we believe it would be preferable to have some other officer of the Board conduct the hearing and make the recommendation to the Board, since the officer authorizing the issuance of the arrest warrants obviously has a preconception as to whether or not there has been a violation of the conditions of parole or mandatory release.

THE WARRANT

The petitioners also assert that the warrant and warrant application were invalid for several reasons. Petitioner Carioscia contends that the application falsely stated that the information upon which it was based was submitted by United States Probation Officer Sanculius. However, at least one letter in the record from Mr. Sanculius to the Board of Parole regarding Mr. Carioscia refutes this allegation.

The petitioners further contend that the information in the warrant applications was unreliable and lacked specificity, that the warrants were insufficient under the Fourth Amendment, and that the charges contained therein are predicated upon guilt by association. The petitioners do not indicate in any way the bases for these contentions and cite no cases in support thereof.

As to the issue of specificity, the warrant applications attached to the warrants served upon the petitioners supplied them in detail with the facts of the events, places, names of persons involved and dates of the alleged parole violations. They further referred specifically to their criminal indictments, which contained even greater detail. The petitioners were thus supplied with the information necessary to apprise them of the grounds for the alleged violations of their mandatory releases with enough specificity to enable them to meet the charges. *Cf.,* Strauss v. Moos, 399 F.2d 1022, 1023 (7th Cir. 1968); Hyser v. Reed, *supra,* 318 F.2d at 245.

The petitioners' Fourth Amendment arguments also are groundless. That Amendment prohibits only the issuance of warrants without probable cause. The facts presented to the Board of Parole clearly meet even a most restricted view of what constitutes probable cause. In any event, the return of the criminal indictments against the petitioners was probable cause for their arrest under the indictments. Giordenello v. United States, 357 U.S. 480, 487, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); United States v. Beyer, 426 F.2d 773, 774 (2d Cir. 1970). The grand jury's determination of probable cause for violation of the narcotics laws, which constitutionally would support an arrest warrant under the indictment, equally constitutes probable cause concerning the petitioners' alleged violations of their mandatory releases and, therefore, the arrest warrants issued by the Board of Parole. The warrants issued by the Board of Parole in these proceedings did not violate the petitioners' Fourth Amendment rights in any way.

The petitioners' claim that the warrants are predicated upon guilt by association is another conclusory statement for which they give no explanation. We presume that they mean that having their mandatory releases revoked because of their alleged association with known criminals in some manner infringes upon some protection afforded to them by the Constitution. The petitioners have not, however, been deemed guilty of any crime because of their association with known criminals, but are merely deemed to have violated one of the valid terms

of their release of which they were fully cognizant, i. e., that they not associate with persons having criminal records. We cannot perceive, therefore, how any right guaranteed by the Constitution has been infringed.

## DOUBLE JEOPARDY

The petitioners next assert, again with no statutory or case authority, that the revocation of their mandatory releases upon the same grounds as alleged in their criminal indictments constitutes double jeopardy. This contention is without merit. The petitioners' mandatory release revocations were in no manner a trial on the charges contained in their indictments. On the contrary, the revocation hearings and resulting incarceration resulted completely from petitioners' previous convictions. The petitioners were merely returned to prison to complete the sentences imposed upon them for their prior criminal actions. They have not been subjected to any form of double jeopardy.

## PROCEDURAL DUE PROCESS

The petitioners' final group of contentions concerns the relationship of the procedure utilized in the revocation hearings to the requirements of procedural due process. The petitioners assert that the denial to them of the right to cross-examine the witnesses who supplied the Probation Officers and through them the Board of Parole with the information which ultimately led to the revocation of their mandatory releases so tainted the proceedings as to deny due process.

The law in the field of procedural due process has been in a state of flux in recent years and it is necessary to state our views of the controlling case law. Broad generalizations on this subject are difficult, if not impossible, and a court can, at best, hope to analogize from the closest decisions on point that can be found. What constitutes due process under any given set of circumstances depends upon the nature of the proceeding involved and the rights, governmental and private, that may possibly be affected by that proceeding. Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed. 2d 1230 (1963); Madera v. Board of Education of the City of New York, 386 F.2d 778 (2d Cir. 1967), cert. denied, 390 U.S. 1028, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968). The Supreme Court has stated these factors as follows:

> " 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. * * * Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960).

Two recent decisions which define procedural due process in two differing situations are particularly relevant to our consideration. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); and Hahn v. Burke, 430 F.2d 100 (7th Cir. 1970), cert. denied, 402 U.S. 933, 91 S.Ct. 1522, 28 L.Ed.2d 868 (1971). In Goldberg, the Supreme Court held that due process requires a public authority to provide a hearing for a welfare recipient before it may terminate his public assistance payments. In outlining and reiterating the balancing test required to define procedural due process in a given case, the Court stated:

> "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss', Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs

the governmental interest in summary adjudication." Goldberg v. Kelly, *supra,* 397 U.S. at 262–263, 90 S.Ct. at 1017.

In Hahn v. Burke, our Court of Appeals, relying significantly upon *Goldberg,* concluded that due process requires a probationer to be afforded a hearing prior to revocation of his probation. The Seventh Circuit found the situation of a probationer facing revocation of probation to be at least as serious as that of the public assistance recipient. The Court stated:

" * * * Weighing the 'extent to which he [the petitioner] may be condemned to grievous loss' against the governmental interest in the summary adjudication we find the petitioner's loss of freedom to outweigh the added state burden of providing a limited hearing to allow petitioner to be confronted with his probation violation and to be heard." *Hahn, supra,* 430 F.2d at 104.

We agree with the Government that *Hahn* may not be treated as precise precedent herein for two reasons. First, *Hahn* dealt with the revocation of probation, not with the revocation of parole or mandatory release and the Court specifically noted that it was not deciding the latter issue. 430 F.2d at 105, fn. 5. Second, the Court in *Hahn* stated that the probationer was entitled to a limited hearing and again noted that it was not then exploring the specific procedural characteristics which such revocation proceedings must have. 430 F.2d at 105, fn. 6. The broad issues presented to us, then, are (1) whether any reason exists to treat the revocation of parole and mandatory release differently from revocation of probation, and, if the answer to this question is negative, (2) whether the scope of the required hearing includes the opportunity for cross-examination of adverse witnesses.

As to the issue of whether parole must be treated differently than probation in terms of the procedures utilized for revocation, we acknowledge that some precedent appears in this Circuit to the effect that there is no right to a hearing prior to parole revocation. *See, e. g.,* Richardson v. Markley, 339 F.2d 967 (7th Cir. 1965); Hughes v. Burke, 334 F.2d 795 (7th Cir. 1964). It is doubtful whether these cases can still be deemed controlling because their foundations have been seriously weakened, if not completely eroded, by the Supreme Court's decisions in *Goldberg* and other recent cases. *See, e. g.,* Sniadach v. Family Finance Corporation, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 5Q7, 27 L.Ed.2d 515 (1971); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

For many years, the requirements of due process turned on the issue of whether the benefit that had been terminated could be classified as a "right" or as a "privilege". If the benefit was classified as a "privilege", due process requirements were minimal or nil and the government was not required to provide much in the way of procedural safeguards upon its termination. If, however, a "right" was involved, the government was compelled to provide increased procedural safeguards to protect against abuse in termination. This distinction in the field of administrative law has slowly fallen by the wayside as courts recognize the futility of such a simplistic distinction and the fact that we have moved into a position where government largess must almost always be considered a form of property rather than a gratuity. *See,* Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Goldberg v. Kelly, *supra;* Shapiro v. Thompson, 394 U.S. 618, 627, fn. 6, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Hahn v. Burke, *supra,* 430 F.2d at 103; Von Alstyne, "The Demise of the Right-Privilege Distinction in Constitutional Law", 81 Harv.L.Rev. 1439 (1967); Reich, "Individual Rights and Social

Welfare: The Emerging Legal Issues," 74 Yale L.J. 1245 (1965); Reich, "The New Property," 73 Yale L.J. 733 (1964). However, prior to the fall of this distinction, the Supreme Court had stated, with other courts following its lead, that no constitutional right to a hearing prior to revocation of probation existed. Escoe v. Zerbst, 295 U.S. 490, 55 S.Ct. 818, 79 L.Ed. 1566 (1935). This conclusion, however, which the *Hahn* court labeled as dicta, 430 F.2d at 105, was grounded on the privilege-right distinction which, as indicated above, no longer exists.

The cases from our Circuit, such as Hughes v. Burke, *supra,* can probably no longer, therefore, be considered as good law. That case clearly was grounded upon the privilege-right distinction. The Seventh Circuit there concluded that no constitutional issue was involved because of the fact that "parole is a matter of grace". 334 F.2d at 797. And cases such as Richardson v. Markley likewise apparently are no longer controlling because of the Seventh Circuit's reliance in them on Escoe v. Zerbst. In *Richardson,* the Court referred to *Escoe's* conclusion that a probationer was not entitled to a full dress hearing prior to revocation of probation and indicated it saw no differentiation between probation and parole. 339 F.2d at 969–970. In subsequently commenting on *Escoe,* the foundation of *Richardson,* the Seventh Circuit has stated in *Hahn:* " * * * The basis of the dicta—the privilege-right distinction—has all but been obliterated by recent Supreme Court opinions * * *." 430 F.2d at 105. We conclude, therefore, that the Seventh Circuit cases holding that no constitutional right exists to a parole revocation hearing, which we would of course recognize as controlling upon us if that Court continued to adhere to them, have had their central rationale so seriously emasculated by the subsequent decisions of that Court in *Hahn* and the Supreme Court in *Goldberg* that we do not deem them to be controlling. *Accord,* Goolsby v. Gagnon, 322 F.Supp. 460 (E.D.Wisc.1971).

We are then faced with the issue of determining, without the aid of prior case law from our Circuit, whether *Hahn* should be applied to revocation of parole and mandatory release as well as to revocation of probation. The Government attempts to argue that a meaningful distinction exists between probation on the one hand and parole and mandatory release on the other. They assert that, in the case of probation, the defendant is not sentenced to imprisonment in the first instance but rather retains his freedom on the basis of a decision rendered by a judge whereas in the case of mandatory release, the defendant is subjected to a second imprisonment following actual custody in a penal institution. While this distinction exists in theory, we do not believe it to be meaningful or persuasive. In both cases, the defendant has been found guilty of violating the criminal laws, is currently subjected to numerous and similar restrictions, is currently not in actual custody, and, should his probation, parole, or mandatory release be terminated, will be deprived of his liberty. *Accord,* Bey v. Connecticut State Board of Parole, 443 F.2d 1079, (2d. Cir. 1971). The loss of freedom to a person in any of these circumstances is certainly grievous and is exactly identical. In this respect, no meaningful distinction can be said to exist between the loss that will be suffered by a probationer, a parolee and a mandatory releasee should their status be revoked. "The fact that a court grants probation whereas an administrative body grants parole does not mean that procedural safeguards against arbitrary action in the revocation process should attach in one instance and not in the other." Goolsby v. Gagnon, *supra,* 322 F.Supp. at 464.

The other criterion which we must examine under the mandate of *Goldberg* is the interest of the Government in securing summary revocation of the prior granted benefit. The Government does not even suggest that it has a more compelling reason to secure summary revocation in the case of parole and mandatory release than in revocation of probation.

*Accordingly, we conclude that the Government does not have a more compelling interest in the case of revocation of probation than in the revocation of parole or mandatory release.*

■ Based upon the criteria out'ined in *Goldberg* for determining the extent to which procedural due process must be afforded to a recipient of a governmental benefit sought to be terminated, we conclude that the rationale enunciated by the Seventh Circuit in Hahn v. Burke as concerns revocation of probation applies with equal force to revocation of parole or mandatory release. *Accord,* Goolsby v. Gagnon, *supra.* The courts have held for a considerable length of time that no meaningful distinction exists between the procedural requirements necessary for revocation of probation and parole. "Congress, which is the source of both of these penological devices has given no indication that the revocation of parole should be more difficult or procedurally different than the revocation of probation." Hyser v. Reed, *supra,* 318 F.2d at 236; Richardson v. Markley, *supra,* 339 F.2d at 970.

Having concluded that Hahn v. Burke applies with equal force to revocation of mandatory release so as to require a hearing prior to such revocation, we are still faced with the necessity of determining whether a mandatory releasee charged by hearsay statements with violating his release must be provided with an opportunity to cross-examine the sources of this adverse information. *Hahn* stated that a "limited" hearing was required "to allow petitioner to be confronted with his probation violation and to be heard", but specifically did not set forth the procedural requirements of that hearing. 430 F.2d at 104, 105, fn. 6. That case, therefore, does not provide us with an easy answer to this question.

We acknowledge initially that Parole Board regulations as structured presently and at all times involved herein require that a hearing be held in revocation proceedings reasonably near the place of the alleged violation of parole or mandatory release, that the releasee be advised that he has the right to be represented by counsel, and that he has the right to have any *voluntary* witnesses who have information relevant and material to the alleged violation testify in his behalf. 28 C.F.R. Secs. 2.40, 2.41. This type of hearing was held for each of the petitioners, with at least the petitioner Carioscia calling certain voluntary witnesses. Thus, certain elements of procedural due process were satisfied by the procedures used at the petitioners' revocation hearings and are not at issue here.

We further note that the most recognized case authority in the field of the constitutional requirements for parole administration, Hyser v. Reed, *supra,* defined procedural due process in a manner that comports with the current Parole Board regulations. In that case, then Judge, now Chief Justice Burger, writing for a majority of the District of Columbia Circuit en banc, held that a parolee does not have a right to cross-examine the adverse source of the Board's information. 318 F.2d at 238–239. Our task, therefore, becomes one of determining whether *Hyser's* conclusion regarding the right to cross-examination of adverse witnesses has been modified by either the subsequent Supreme Court decision in *Goldberg* or by the Seventh Circuit decision in *Hahn*.

The decision in *Hyser* regarding the lack of any right to confrontation and cross-examination of adverse witnesses in parole revocation hearings relied heavily on Cafeteria and Restaurant Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), and Escoe v. Zerbst, *supra.* In *Cafeteria Workers,* the Supreme Court stated that the Fifth Amendment does not require a hearing in every conceivable case of government impairment of private interest and that due process is not a technical concept but rather "is compounded of history, reason, the past course of decisions." 367 U.S. at 894, 81 S.Ct. at 1748. We believe that this flexible view towards the Fifth Amendment remains fully valid today. *Cf., Goldberg,* 397 U.S. at 263, 90 S.Ct.

1011, 25 L.Ed.2d 287. *Hyser's* conclusion, thus, must be viewed as merely an application of this presently valid balancing test, but one which was rendered under the controlling precedent of that time.

*Cafeteria Workers* involved the summary dismissal of a public employee in a defense industry for "security reasons." The fact that she was not granted any hearing *whatsoever* to refute the charges against her was not deemed by the Supreme Court to be a violation of the Fifth Amendment. As is apparent from the dissent in *Goldberg* by Mr. Justice Stewart, 397 U.S. at 285, it is clear that the latter is an advance from the position of the Court in *Cafeteria Workers*. Because the majority in *Goldberg* noted that the need to public assistance by a welfare recipient is more significant and does require greater procedural protection than that which must be afforded to a public employee involved with the government in its "proprietary military capacity," *Goldberg*, 397 U.S. at 263–264, fn. 10, 90 S.Ct. 1011, and because our Court of Appeals has in *Hahn* stated that the plight of a probationer who is being denied his freedom is at least as serious as that of a welfare recipient being denied public assistance, 430 F.2d at 104, we conclude that the rationale behind *Hyser's* conclusions regarding the lack of a right of confrontation of adverse witnesses by a parolee facing revocation of parole is not currently the law, at least not in this Circuit. We further note that the *Hyser* court, in addition to relying upon cases that apparently no longer have the force they once had, gave an unduly restrictive reading to Green v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). As discussed below, that case was relied upon quite heavily by the Supreme Court in *Goldberg* in reaching the opposite conclusion, i. e., that confrontation and cross-examination of adverse witnesses was required. Accordingly, because of both *Goldberg* and *Hahn*, we do not believe *Hyser* to be currently binding law on this issue.

In the final analysis, *Goldberg* is the opinion to which we must turn to resolve the issue before us. In that case, the Court not only required a hearing, but outlined the precise scope of that hearing and the rationale therefor. In delineating the scope of the required hearing, the Court concluded that due process requires an opportunity for the aggrieved person to confront and cross-examine adverse witnesses. 397 U.S. at 269–270, 90 S.Ct. 1011. The Court stated the grounds for its conclusion as follows:

"In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses. [Citations omitted] What we said in Green v. McElroy, 360 U.S. 474, 496–497 [79 S.Ct. 1400, 3 L.Ed.2d 1377] (1959), is particularly pertinent here: 'Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment. * * * This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases. * * * but also in all types of cases where administrative. * * * actions were under scrutiny.' Welfare recipients must therefore be given an opportun-

ity to confront and cross-examine the witnesses relied on by the department." *Goldberg,* 397 U.S. at 269–270, 90 S.Ct. at 1021.

■■■ Acknowledging the Supreme Court's recognition that, under the always necessary flexible approach to due process, its holding does not apply to every conceivable type of proceedings relating to the termination of governmental benefits, 397 U.S. at 263, 90 S.Ct. 1011, we nevertheles believe that, given the serious consequences of parole revocation, the rationale advanced by the Court in *Goldberg* applies with at least equal vigor to the present situation. In any event, as the Seventh Circuit in *Hahn* has equated the plight of the probationer facing revocation to that of the public assistance recipient facing welfare termination, we believe that the conclusion of *Goldberg* regarding the right to confrontation and cross-examination must be deemed applicable in a parole or mandatory release revocation proceedings. We are, therefore, unable to follow the cases cited by the Government which were either pre-*Goldberg* or which specifically rejected *Hahn* and which hold that no right to confrontation and cross-examination exists in parole revocation hearings. Morrissey v. Brewer, 443 F.2d 942 (8th Cir. 1971); Alverez v. Turner, 422 F.2d 214 (10th Cir. 1970); Davis v. United States, 288 F.Supp. 180 (W.D.Mo.1968); Gibson v. Markley, 205 F.Supp. 742 (S.D.Ind.1962).

There is another basis for the conclusion that a parolee or mandatory releasee facing revocation of his parole or release must be provided with an opportunity to confront and cross-examine the government agents relied upon by the Board in making its final determination. As discussed above, the primary tests to be utilized in defining due process in any given situation are the grievous loss to the individual and the potential burden upon the Government should an asserted procedural right be required. We have previously discussed the grievousness of the loss of a person's liberty even if that liberty is conditional. And the Govern-

ment makes little, if any, argument that the revocation proceedings would become too burdensome if an opportunity to cross-examine adverse witnesses were required. We do not believe that permitting cross-examination of government agents who reported alleged parole violations would add a substantial additional burden to the present system because Board of Parole regulations currently require that: (1) a hearing be afforded any parolee who claims not to have violated his parole; (2) a Board member or appointed examiner conduct the hearing; and (3) the hearing be held near the site of the alleged violation. In addition they authorize the calling of voluntary witnesses and the retention of counsel. A hearing near the site where the government agents determined a violation of parole occurred, where other witnesses may be called and counsel be present is now required and the further requirement that the Government produce, if requested, its agents at the hearing does not appear to be a very substantial or time-consuming burden. Accordingly, we conclude that when a parolee or mandatory releasee is charged with violation of his parole based in substantial part upon the hearsay testimony of government agents, those agents must, if requested by the parolee or releasee, be brought to the hearing before the Board of Parole for confrontation and cross-examination. We note, in this connection, that at least two other courts have recently held that the failure to have counsel present at parole revocation hearings of indigent parolees violated their due process rights. Bey v. Connecticut Board of Parole, 443 F.2d 1079 (2d Cir. 1971); Goolsby v. Gagnon, 322 F.2d 460 (E.D. Wis.1971). We have no doubt that the administrative cost in time and money to meet such a requirement will be substantially greater than that of meeting the relatively minor requirement enunciated herein.

The logic of this conclusion is particularly compelling when viewed in the factual context of the instant proceedings. Both the testimony adduced at the hear-

ing held by this Court on the habeas corpus petitions and the transcripts of the revocation hearings held by the Board of Parole indicates the following. (We will discuss the facts specifically of petitioner Carioscia, but his case is typical of all three petitioners.)

The warrant application submitted to the Board of Parole, a copy of which was supplied to the petitioner as notice of the charges against him, contained two groups of alleged violations of his mandatory release conditions. The first dealt with alleged violations of the federal narcotics laws, which are not at issue herein. The other charged the petitioner with association with known criminals. The basis for these assertions were statements by federal narcotics agents who claimed to have witnessed these meetings. At the end of this charge in the warrant application it was stated: "All of these meetings (the alleged violations) were observed in Chicago, Illinois and the narcotics agents would be willing to appear as witnesses at the revocation hearing."

Prior to the hearing, Carioscia's attorney, via letter, contacted the Assistant United States Attorney connected with the current indictments of petitioners, requesting that the narcotics agents who stated that they would be willing to appear as witnesses be brought to the hearing. At the hearing itself, the same request was made of Mr. Pace. He responded that he had contacted the Assistant United States Attorney who informed him that the agents would not testify unless requested to do so by the Parole Board and that any testimony that they would proffer would not be favorable to the petitioners. Mr. Pace further stated that since he believed, because of his discussion with the Assistant U. S. Attorney, that the agents would not testify favorably to the petitioners, he instructed them not to appear at the hearing.

Although we have no doubts as to the integrity of both the Assistant United States Attorney and the Parole Executive, this procedure is certainly inconsistent with fundamental due process for it vests the prosecutor's office with the final determination of whether or not the sources of more than half of the charges against the petitioner might be favorable to him if they testified and, perhaps more importantly, with the determination of whether or not witnesses desired to be called by the parolees whose freedom is in jeopardy will appear.

We do not know or hazard a guess whether or not any statements that the witnesses would have proffered might have been favorable to the petitioners. But we do know, as the Supreme Court opined in *Goldberg*, that in almost every setting where important decisions turn on questions of fact, the right to cross-examine the testimony of individuals is crucial to determine if their memory may be faulty or if they in fact may be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. "No man should be subjected to the arbitrary acts, or the possibility of arbitrary acts, of another man even though the other man be a good man." Goolsby v. Gagnon, *supra*, 322 F.Supp. at 464.

In these proceedings, the Board of Parole was presented with unsworn hearsay reports of Probation and Parole Officers based on statements of agents who allegedly viewed the violations of the petitioners' mandatory releases. The agents did not give testimony under oath and were not, of course, available for cross-examination by petitioners' counsel. We do not believe that such a hearing can be considered "meaningful", as the due process clause requires, Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), when no opportunity is presented to question or test the source or validity of the hearsay allegations. We again note that we are not attacking explicitly or by insinuation the integrity of any of the parties involved. But the potential for abuse in the system as it is presently structured is obvious when substantial portions of the alleged vio-

lations presented to and obviously relied upon by the Board of Parole are based on nothing more than hearsay reports of assertions by government agents and no opportunity for cross-examining them is afforded. "It is significant that most of the provisions of the Bill of Rights are procedural, for it is procedure that marks much of the difference between rule by law and rule by fiat." Wisconsin v. Constantineau, 400 U.S. 433, 91 S. Ct. 507, 27 L.Ed.2d 515 (1971).

We have reviewed all other assertions of the petitioners and do not deem them valid. We conclude, however, that the petitioners were deprived of due process when the Parole Executive, upon the advice of an Assistant United States Attorney, refused to allow them to confront and cross-examine the adverse witnesses who supplied the hearsay allegations that constituted a substantial portion of the charges against them and who were willing to testify as to these factual matters at the revocation hearing if requested to do so.

As previously noted, two grounds for revocation of petitioners' mandatory releases were asserted. There is, of course, no way of knowing whether the Parole Board's decision was based on one or the other or both. We are, therefore, unable to determine whether the failure to afford petitioners due process in their hearings was crucial. If the decision was based solely on their current indictment and arrest, the failure to permit them to cross-examine witnesses whose testimony would be relevant to the charge that they associated with persons having a criminal record would be immaterial. If, on the other hand, it was based solely or in part on such alleged associations, it is invalid. It seems highly likely that both grounds were in fact considered by the Board. In any event, on the present record, we are compelled to conclude that the failure to accord petitioners a meaningful hearing invalidates the revocation of their mandatory releases.

Pursuant to the provisions of Rule 52 (a) of the Federal Rules of Civil Procedure, this opinion shall constitute the findings of fact and conclusions of law of the Court. An order will enter: (1) declaring the revocation of petitioners' mandatory releases to be null and void; (2) granting the Board of Parole forty-five days from the date of this decision in which to hold new revocation hearings in accordance with this opinion; and (3) if the Board of Parole should decline to hold new revocation hearings, granting the writs of habeas corpus and placing the petitioners back on mandatory release without prejudice to any other prior or future order in the pending criminal cases in which they are defendants.